**Susan Russell, OSB No. 894518**
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel:    (503) 326-2123**
**Fax:    (503) 326-5524**
**Email: Susan_Russell@fd.org**

**Attorney for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:16-cr-00453-AA** |
| **Plaintiff,** | |
| | **MOTION TO SUPPRESS** |
| | **EVIDENCE AND STATEMENTS** |
| **v.** | **AND MEMORANDUM OF LAW** |
| | **IN SUPPORT OF MOTION** |
| **RICHARD CODY JACKSON,** | |
| | **EVIDENTIARY HEARING** |
| **Defendant.** | **REQUESTED** |

## Table of Contents

**Page**

Introduction ........................................................................................................................... 1

Statement of Case ................................................................................................................. 1

Statement of Facts ............................................................................................................... 2

Argument ............................................................................................................................... 11

A.    Officer Lehman Violated Mr. Jackson's Fourth Amendment Right Not To
Be Subject To An Unreasonable Search And Seizure By Unconstitutionally
Extending the Traffic Stop to Perform A Drug Investigation Without
Reasonable Suspicion. ................................................................................................ 11

B.    Mr. Jackson Did Not Knowingly And Intelligently Waive His *Miranda*
Rights Prior To Being Questioned By The Police Officers And His
Statements Must Be Suppressed. ........................................................................... 23

Conclusion............................................................................................................................. 28

# Table of Authorities

## Federal Cases

*Berkemer v. McCarty,*
   468 U.S. 420 (1984) ........................................................................ 11

*Connecticut Nat'l Bank v. Germain,*
   503 U.S. 249 (1992) ........................................................................ 19

*Consumer Product Safety Commission v. GTE Sylvania, Inc.,*
   447 U.S. 102 (1980) ........................................................................ 19

*Coolidge v. New Hampshire,*
   403 U.S. 443 (1971) ........................................................................ 11

*Florida v. Royer,*
   460 U.S. 491 (1983) ........................................................................ 12

*Georgia v. Randolph,*
   547 U.S. 103 (2006) ........................................................................ 11

*Illinois v. Caballes,*
   543 U.S. 405 (2005) .................................................................... 11-12

*Johnson v. Zerbst,*
   304 U.S. 458 (1938) ........................................................................ 25

*Jones v. United States,*
   357 U.S. 493 (1958) ........................................................................ 11

*Katz v. United States,*
   389 U.S. 347 (1967) ........................................................................ 11

*Miranda v. Arizona,*
   384 U.S. 436 (1966) ........................................................................ 23

*Missouri v. Seibert,*
   542 U.S. 600 (2004) ........................................................................ 23

*Moran v. Burbine,*
   475 U.S. 412 (1986) .................................................................... 24, 25

*North Carolina v. Butler,*
   441 U.S. 369 (1979) ...................................................................................... 25

*Rodriguez v. United States,*
   135 S. Ct. 1609 (2015) ..................................................... 1, 11, 12, 13, 14

*United States v. Abarza,*
   143 F.Supp.3d 1082, 1094-95 (2015), *clarified on reconsideration, United States v. Abarza,*
   199 F.Supp.3d 1270 (2016) ............................................................................ 27

*United States v. Bailey,*
   743 F.3d 322 (2d Cir. 2014) ......................................................................... 23

*United States v. Chavez-Valenzuela,*
   268 F.3d 719 (9th Cir. 2001) ....................................................................... 13

*United States v. Digiovanni,*
   650 F.3d 498 (4th Cir. 2011) ................................................... 13-14, 14, 15

*United States v. Gorman,*
   859 F.3d 706 (9th Cir. 2017) ................................................................... 1, 14

*United States v. Izguerra-Robles,*
   660 F.Supp.2d 1202 (D. Or. 2009) .................................................. 17, 26, 27

*United States v. Jeffers,*
   342 U.S. 48 (1951) ....................................................................................... 11

*United States v. Kaguras,*
   183 Fed. Appx. 783 (10th Cir. 2006) ........................................................... 12

*United States v. Lopez-Arias,*
   344 F.3d 623 (6th Cir. 2003) ....................................................................... 23

*United States v. Montgomery,*
   561 F.2d 875 (D.C. Cir. 1977) ................................................................ 28-29

*United States v. Mota,*
   982 F.2d 1384 (9th Cir. 1993) ..................................................................... 25

*United States v. Rodriguez,*
   869 F.2d 479 (9th Cir. 1989) ....................................................................... 23

*United States v. Shepherd,*
    21 F.3d 933 (9th Cir. 1994) ................................................................. 25

*United States v. Strickler,*
    490 F.2d 378 (9th Cir. 1974) ............................................................... 23

*United States v. Washington,*
    387 F.3d 1060 (9th Cir. 2004) ............................................................ 27

*United States v. Washington,*
    739 F. Supp. 546 (D. Or. 1990) .................................................... 18, 27

*United States v. Wendfeldt,*
    58 F.Supp.3d 1124 (D. Nev. 2014) ..................................................... 14

*Wolf v. Colorado,*
    338 U.S. 25 (1949) ....................................................................... 10-11

*Wong Sun v. United States,*
    371 U.S. 471 (1963) ..................................................................... 24-25

## Federal Statutes

18 U.S.C. § 922(g) ................................................................................. 1

21 U.S.C. § 841(a)(1) and (b)(1)(B) ...................................................... 1

## State Cases

*Longshore v. State,*
    399 Md. 486 (Md. Ct. App. 2007) ...................................................... 23

*State v. Auer,*
    90 Or.App. 459 (1988) ....................................................................... 18

*State v. Hall,*
    238 Or. App. 75 (2010) ...................................................................... 16

*State v. Porter,*
    312 Or. 112 (1991) ............................................................................. 25

*State v. Rodgers,*
    347 Or. 610 (2010) ....................................................................... 17, 27

*State v. Watson*,
  353 Or. 768 (2013) ................................................................................................ 16

## State Statutes

ORS 131.615 ........................................................................................................... 16

ORS 807.570 ............................................................................................... 17, 18, 27

ORS 807.570(4) .......................................................................................... 17, 18, 21

ORS 810.410 (3)(b) ............................................................................. 15, 16, 17, 18

ORS 810.410(3) ...................................................................................................... 25

## Federal Rules of Criminal Procedure and Constitutional Amendment

Fed. R. Crim. P. 12 .................................................................................................. 1

Fourth Amendment to the U.S. Constitution ................................... 1, 10, 11, 23, 28

**Introduction**

Richard Cody Jackson, through his attorney, Assistant Federal Public Defender Susan Russell, hereby seeks an order directing suppression of all evidence derived from the unconstitutional search and seizure of his person and vehicle.  The video recording of this seizure establishes that the officer prolonged the traffic stop to perform a drug investigation, which "is unlawful because these tasks are 'aimed at detecting evidence of ordinary criminal wrongdoing' and are not 'ordinary inquir[ies] incident to the traffic stop.'" *United States v. Gorman,* 859 F.3d 706, 715 (9th Cir. 2017) (quoting *Rodriguez v. United States,* 135 S. Ct. 1609, 1615 (2015)). This motion is brought under the Fourth Amendment to the United States Constitution and Fed. R. Crim. P. 12, supported by the accompanying memorandum of law.

**Statement of Case**

Mr. Jackson is charged with possession with intent to distribute methamphetamine and being a felon in possession of a firearm, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 922(g). Mr. Jackson was arraigned on the indictment on January 15, 2017. Trial is currently scheduled to take place on January 23, 2018.

The charges against Mr. Jackson are based on his alleged possession of controlled substances and a firearm that were seized by law enforcement agents during the course of a traffic stop and warrantless search of his vehicle. Mr. Jackson seeks suppression of the

Page 1   MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN
            SUPPORT OF MOTION

evidence because his arrest and detention exceeded the lawful scope of the traffic stop,

which was unconstitutionally extended in order to perform a criminal investigatory stop

without reasonable suspicion. Accordingly, the evidentiary fruits of this stop and

subsequent search, including the discovery and seizure of the drugs and firearm, as well

as all statements obtained from Mr. Jackson, must be suppressed.

## Statement of Facts

On Tuesday, October 4, 2016, at 3:43 p.m., Corporal Jonathan E. Lehman of the

Pendleton police department conducted a traffic stop of a vehicle driven by 27-year-old

Richard Cody Jackson.  According to the police reports, Officer Lehman conducted a

traffic stop of Mr. Jackson's vehicle, a black 2008 Ford Fusion bearing Oregon license plate

126JBG, because it was traveling northbound "at a high rate of speed."[1]  Officer Lehman

was parked in a marked police car on a public street in Pendleton, when he clocked

Mr. Jackson's vehicle traveling 27 miles per hour in a 20 mile per hour school zone,

according to the displayed target speed on his radar unit. Officer Lehman's traffic stop of

Mr. Jackson's vehicle was videotaped with visual and auditory recordings.

Officer Lehman initiated the traffic stop by activating his emergency overhead

lights. One other vehicle was positioned between Officer Lehman's police car and the

---

[1] Unless otherwise specified, the factual summary comes from police reports
provided by the government in discovery, including the taped video of the traffic stop.

Page 2  MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN
        SUPPORT OF MOTION

vehicle driven by Mr. Jackson.  That vehicle was being driven at roughly the same speed as Mr. Jackson's vehicle but was not pursued by Officer Lehman. When Officer Lehman activated his emergency overhead lights, Mr. Jackson did not speed up or otherwise attempt to elude the officer. To the contrary, Mr. Jackson promptly pulled over his vehicle to the roadside curb, using his right turn signal.

At 3:43:42 p.m., Officer Lehman radioed police dispatch with the license plate number for Mr. Jackson's vehicle. Officer Lehman, dressed in a police uniform, then exited his vehicle. The overhead emergency lights on his police car remained activated throughout the traffic stop.

Officer Lehman approached the driver's side door and identified himself to Mr. Jackson, the driver and sole occupant of the vehicle. Officer Lehman advised Mr. Jackson that he was being stopped because Officer Lehman had clocked his vehicle driving 27 mph in a 20 mph speed zone and informed Mr. Jackson that their conversation was being recorded. Officer Lehman asked Mr. Jackson for his driver's license and registration. Officer Lehman did not indicate or otherwise tell Mr. Jackson that Officer Lehman already knew Mr. Jackson's name and identity as well as other details about him, though Officer Lehman later made this known.

As Officer Lehman stood beside the driver's side door, Mr. Jackson began to look around the inside of his vehicle for his driver's license. He did so "for a brief minute,"

according to Officer Lehman, before telling the officer, "I can't find my wallet."
Mr. Jackson explained to Officer Lehman that he did have a valid driver's license and
voluntarily requested that the officer confirm he had a license: "Can you run my name?"
At 3:44:42 p.m., Mr. Jackson told Officer Lehman his name: Richard Jackson. At no point
did Mr. Jackson tell the officer his middle name, Cody, the name by which Mr. Jackson is
generally known.

Although Mr. Jackson provided Officer Lehman his name, stated he had a valid
driver's license, and asked Officer Lehman to run his license, Officer Lehman did not run
Mr. Jackson's name through police dispatch to confirm Mr. Jackson's driver's license. In
his written police report, Officer Lehman detailed that, although Mr. Jackson advised that
he could not find his driver's license, "he continued looking around the center console
area. It appeared JACKSON was being secretive as he turned his body in a way, it
obstructed my view." Officer Lehman wrote that he observed Mr. Jackson place his hand
on some type of black object located between the driver's seat and the center console.

At 3:44:48 p.m., Officer Lehman asked Mr. Jackson to step out of the vehicle "for a
minute." As Mr. Jackson was getting out of the vehicle, Officer Lehman wrote in his
police report that he was able to get a better look at the black object he observed between
the driver's seat and the center console. Officer Lehman described this object as
appearing to be some type of a small baton or club wrapped in black electrical tape. In the

**Page 4  MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN
SUPPORT OF MOTION**

contemporaneous audio recording of the traffic stop, Officer Lehman described this item as a "weapon or stick or something in the vehicle." Officer Lehman did not examine the object further to determine what it was, nor did he question Mr. Jackson about the item, or seek to secure the object or remove it from the vehicle.

At 3:44:58 p.m., immediately after Mr. Jackson exited the vehicle, Officer Lehman told Mr. Jackson to turn around as he placed Mr. Jackson in handcuffs. Mr. Jackson asked Officer Lehman why he was being detained. Officer Lehman replied, for "failure to carry and present." Mr. Jackson told the officer, "I have my wallet. Can I grab it for you?" Officer Lehman replied, "You just said you didn't have your wallet. Now you do have your wallet?" Mr. Jackson stated, "I can get it, sir."

At 3:45:19, Officer Lehman radioed into police dispatch that he had "one detained." Officer Lehman did not provide Mr. Jackson's name to police dispatch nor did he ask them to run Mr. Jackson's driver's license.

Mr. Jackson again told the officer that his wallet was somewhere inside the vehicle and asked to be let out of handcuffs so that he could look further and retrieve his license. Officer Lehman told Mr. Jackson that he was not going to remove the handcuffs to let him "just go digging around" given that the officer had seen "a weapon or stick or something" in the vehicle and that Mr. Jackson had already told the officer that he did not have his

Page 5   MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN
          SUPPORT OF MOTION

driver's license. Officer Lehman wrote in his report that Mr. Jackson "appeared to be extremely nervous as his hands were shaking uncontrollably."

At 3:45:50 p.m., as he continued to question Mr. Jackson about drug activity, Officer Lehman put on black rubber gloves in apparent preparation to conduct a search of Mr. Jackson and his vehicle. While Mr. Jackson remained in handcuffs, standing outside his vehicle beside a uniformed officer on a busy road "with a lot of traffic going by," Officer Lehman told Mr. Jackson that he was "not under arrest" but that "at this point" he was "not free to go." Officer Lehman advised Mr. Jackson of his *Miranda* rights, which Mr. Jackson stated he understood.

Mr. Jackson again told the officer that his driver's license was in his wallet somewhere in the car but he was not sure exactly where it was. He stated he thought he had put it in the side pocket, that it was his friend's car, and that he could get it for the officer. "So where's your wallet at?" Officer Lehman asked. "So you want me to grab it?"

Rather than confirming Mr. Jackson's driver's license through his readily available police radio, Officer Lehman began questioning Mr. Jackson about drug activity. Officer Lehman made no further inquiries concerning the purported Failure to Carry or Present a License traffic offense, other than in response to Mr. Jackson's questioning as to why he was being detained.

At 3:46:29, Officer Lehman told Mr. Jackson, "So here's the deal, Cody. I know what you do, I know what you're about, and I have a drug dog in my car. I'm just letting you know right up front. I'll be cool with you and I'll work with you." Officer Lehman referred to Mr. Jackson by his middle name, "Cody," the name by which Mr. Jackson is generally known, although Mr. Jackson never told Officer Lehman his middle name nor that he goes by this.

Officer Lehman told Mr. Jackson again, "I'll be cool with you, you work with me, I'll work with you, it's as simple as that." Officer Lehman then asked: "You got a little dope on you?" Mr. Jackson did not reply.  Officer Lehman stated, "Just be honest with me, dude. I'll be fair with you. How much do you have on you? A little bit?"

When Mr. Jackson did not reply to this question, Officer Lehman said, "Okay, let's walk back to my car," pointing to his marked police car. Officer Lehman closed the driver's side door of Mr. Jackson's vehicle and asked whose vehicle it was. Mr. Jackson replied that it belonged to Jessica Homan.

Officer Lehman told Mr. Jackson, "Here's the deal. You be straight with me right now and I'll be cool with you, okay?" Officer Lehman told Mr. Jackson that "word on the street" was that Mr. Jackson was "running some dope and running some guns." The officer then repeated his prior statement that if Mr. Jackson was straight with him, the officer would be fair with Mr. Jackson. Officer Lehman again asked whether there was

**Page 7   MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

any dope in the car. "You're not answering my question," Office Lehman stated to

Mr. Jackson. "I'm asking you a simple question." Again Mr. Jackson did not respond.

According to the officer, Mr. Jackson would not "make eye contact." Officer

Lehman told Mr. Jackson that if there was dope in the car, now would be a good time to

tell him. He stated he was going to get his drug detection dog out of his police car.

At 3:48:25 p.m., Officer Lehman radioed into police dispatch and requested a

backup police car. Again Officer Lehman did not provide police dispatch with

Mr. Jackson's name or ask that his driver's license be run.

Officer Lehman did not conduct a sweep of Mr. Jackson's vehicle with his drug

detection dog. Nor did he pat down Mr. Jackson for weapons or ask whether he had any

weapons, either on his person or in his vehicle. Rather, Officer Lehman continued to

question Mr. Jackson about whether he possessed any dope.  Again, Mr. Jackson did not

respond to this questioning.

"It's very simple," Officer Lehman said. "I'll work with you," "I won't jam you

up," and if there were drugs in the vehicle, it "doesn't mean you have to go to jail," "I'll be

fair with you."

At 3:48:45 p.m., while handcuffed and detained, standing in plain public view next

to a uniformed police officer in front of a marked police car with activated overhead lights

**Page 8   MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN
SUPPORT OF MOTION**

on a busy city street during daylight hours with "a lot of traffic going by," Mr. Jackson

told Officer Lehman that there was "some dope" in his vehicle.

Officer Lehman repeated to Mr. Jackson that he was being detained in handcuffs

because "you don't have a driver's license," and that Officer Lehman was not going to

remove the handcuffs, "I'm not going to give you the chance to run." Mr. Jackson again

stated he didn't understand why he was in custody. Officer Lehman reiterated "because

you don't have a driver's license, you're failing to carry and present." Mr. Jackson told the

officer, "I have a driver's license." Officer Lehman responded: "you're failing to carry and

present your driver's license."

Officer Lehman continued to question Mr. Jackson about possessing "some dope,"

pressing for more details. Shortly after Mr. Jackson admitted having "some dope," Officer

Studebaker arrived on the scene in another marked police car. Officer Lehman told

Mr. Jackson, "be straight with me, man," that this would result in them spending "less

time out here in front of everybody."

Eventually Mr. Jackson told Officer Lehman that the dope, methamphetamine,

along with a gun, were located inside his vehicle in a shoebox on the backseat.

At 3:52:10 p.m., Officer Lehman asked Mr. Jackson for the first time if he had weapons on

his person and searched him.

**Page 9   MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN
SUPPORT OF MOTION**

At 3:53:25 p.m., a full ten minutes after Officer Lehman initiated the traffic stop, he radioed into police dispatch and made his first request that they run "Richard Cody Jackson," including a criminal history check. One minute later, at 3:54:34 p.m., police dispatch responded that Richard Cody Jackson had a "valid" Oregon driver's license. Officer Lehman told dispatch to disregard his prior request for a criminal history check because he "already knew" that Mr. Jackson was on felony probation. Officer Lehman recovered the contraband items from Mr. Jackson's vehicle.

At 3:55:45 p.m., while Mr. Jackson remained handcuffed on the street, standing in front of Officer Lehman's marked police car, Officer Lehman placed a cellular phone call and informed the person he was calling that "I just stopped Richard Cody Jackson." Officer Lehman described the contraband items seized and stated, "I don't know if you want to do anything or even give it a shot, but I just wanted to give you a head's up." At 4:12:00 p.m., Mr. Jackson was placed in the back of Officer Lehman's police car.

Mr. Jackson was lodged without incident at the Umatilla County Jail on charges of unlawful possession and delivery of methamphetamine as well as felon in possession of a weapon. The owner of the vehicle, Jessica Homan, was contacted by the police to take possession of her vehicle, which she did.

## Argument

A.    **Officer Lehman Violated Mr. Jackson's Fourth Amendment Right Not To Be Subject To An Unreasonable Search And Seizure By Unconstitutionally Extending the Traffic Stop to Perform A Drug Investigation Without Reasonable Suspicion.**

"The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." *Wolf v. Colorado*, 338 U.S. 25, 27 (1949). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Searches and seizures conducted without prior approval by a judge or magistrate are per se unreasonable, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *see Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (exceptions to the warrant requirement are "jealously and carefully drawn") (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)). It is the government's burden to establish that a warrantless seizure is justified. *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971); *United States v. Jeffers,* 342 U.S. 48, 95 (1951).

Federal courts have repeatedly emphasized the strict constitutional limits applicable to traffic stops.  As the Supreme Court held in *Rodriguez v. United States*, 135 S. Ct. at 1614, a "seizure for a traffic violation justifies a police investigation of *that violation*"

(emphasis added). As in the context of a *Terry*-stop,[2] "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' - to address the traffic violation that warranted the stop." *Rodriguez*, 135 S. Ct. at 1615 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification.").

In *Rodriguez*, the Court held that police officers conducting a traffic stop investigation may only engage in focused inquiries directed toward investigating the basis for the stop and issuance of a citation, and ascertaining the roadworthiness of the driver and his vehicle:

> Beyond determining whether to issue a traffic ticket, an officer's mission typically includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

135 S. Ct. at 1615 (citations omitted).

In so holding, the *Rodriguez* Court found that a traffic stop scene investigation for other crimes, including the taking of safety precautions to facilitate such investigation, must be independently justified by reference to facts other than those that justified the

---

[2] The Supreme Court has opined that a routine traffic stop is "analogous" to what is known as a "*Terry* stop." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

**Page 12 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

initial traffic stop. *Id*. at 1615; *accord United States v. Kaguras*, 183 Fed. Appx. 783, 786 (10th Cir. 2006)("A traffic stop that is extended without consent, even for a relatively short duration, is unconstitutional absent a reasonable and articulable suspicion justifying the further detention.").

Absent such independent justification, extending a traffic stop beyond the time reasonably needed to complete the traffic stop investigation and citation process is unconstitutional:

> We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.

*Rodriguez,* 135 S. Ct. at 1612 (citation omitted). The *Rodriguez* Court reasoned that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop[.]" *Id.* at 1614. "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* Accordingly, any "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.; see also United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001) (Given that the scope of an investigative detention must be carefully tailored to its underlying justification, "[a]n officer must

**Page 13 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

initially restrict the questions he asks during a stop to those that are reasonably related to the justification for the stop."); *United States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011) ("In the context of traffic stops, police diligence involves requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket. If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive the driver's consent.")(citations omitted).

The *Rodriguez* Court found that "the Government's endeavor to detect crime in general or drug trafficking in particular" cannot justify prolonging an ordinary traffic stop to conduct a canine narcotic investigation. 135 S. Ct at 1616. Such "[o]n-scene investigation into other crimes . . . detours from an officer's traffic-control mission." *Id.* at 1611; *see also United States v. Gorman,* 859 F.3d 706, 715 (9th Cir. 2017) ("We have held that prolonging a traffic stop to perform an ex-felon registration check or a dog sniff is unlawful because these tasks are 'aimed at detecting evidence of ordinary criminal wrongdoing' and are not 'ordinary inquir[ies] incident to the traffic stop.'") (citations omitted); *United States v. Wendfeldt*, 58 F.Supp.3d 1124, 1133 (D. Nev. 2014) (police officer's "additional pointed questions regarding whether [defendant] had illegal contraband, and then directing him to stand to the side of the patrol vehicle when

[defendant] refused to consent to a search, were not *de minimis"* nor was a subsequent two-and-a-half minute delay for a dog sniff to occur).

In *United States v. Digiovanni*, 650 F.3d at 498, the court evaluated a traffic stop that raised issues similar to those presented here. The *Digiovanni* court found that the police had unreasonably extended the traffic stop by turning it into a drug investigation without reasonable suspicion. *Id.* at 515. In so finding, the court summarized the relevant factors to be considered in determining whether the officer acted with due diligence in completing the purposes of the traffic stop:

> [T]he reasonableness of a police officer's actions during a traffic stop turns on his diligence in accomplishing the purposes of stop, that is, investigating whether a traffic infraction occurred and issuing a ticket. . . . [D]iligence is not present where the police officer "definitely abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation" or where the unrelated questions "constituted the bulk of the interaction" between the police officer and the defendant.

*Id.* at 508-09 (citations omitted).

Oregon courts have similarly emphasized the inherent investigative limits to a traffic stop.  Police authority to detain and investigate during a traffic stop is set forth in Oregon Revised Statute (ORS) 131.615 and 810.410 and mirrors the federal constitutional restrictions. "A police officer may stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation." ORS 810.410 (3)(b). A police officer may conduct inquiry into

**Page 15 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

circumstances arising during the course of the stop only when these "give rise to a reasonable suspicion of criminal activity" and an officer may request consent to search in connection with that inquiry. ORS 810.410(3)(c) and (e).[3]

In the context of a traffic infraction stop, "an officer's authority to detain a person based on reasonable suspicion is limited to activities that are reasonably related to the investigation of the suspected violation and reasonably necessary to effectuate that investigation." *State v. Watson*, 353 Or. 768, 777 (2013). "When police officers detain a person on probable cause of violating a traffic law, it is reasonable to determine whether the person is licensed to continue on his or her way after the encounter ends." *State v. Hall*, 238 Or. App. 75, 79 (2010). Where a defendant lacks a driver's license or other form of identification, a warrants check may be seen as "reasonably related to the purpose of determining the defendant's identity." *Watson*, 353 Or. at 780. However, as soon as all conduct involved in investigating an infraction and ticketing the offending motorist has come to an end, lawful authority to continue to detain the motorist also comes to an end:

---

[3] ORS 131.615 similarly provides that a peace officer who "reasonably suspects" that a person has committed or is about to commit a crime, may stop that person and "make a reasonable inquiry." The inquiry will be considered reasonable only if it is limited to (a) "[t]he "immediate circumstances that aroused the officer's suspicion;" (b) "[o]ther circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of additional criminal activity;" and (c) "[e]nsuring the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons."

Page 16 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION

> Police authority to perform a traffic stop arises out of the facts that created probable cause to believe that there has been unlawful, noncriminal activity, *viz.*, a traffic infraction. Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation.

*State v. Rodgers*, 347 Or. 610, 623 (2010) (*en banc*)(emphasis in original).

With respect to the traffic offense at issue in Mr. Jackson's case, Failure to Carry or Present a License contrary to ORS 807.570, the Oregon legislature has placed additional restrictions on the circumstances in which a police officer can lawfully detain an individual for this Class C misdemeanor. ORS 807.570(4) provides that:

> A police officer may detain a person arrested or cited for the offense described in this section *only for such time as reasonably necessary to investigate and verify the person's identity*.

(emphasis added).

The statutory limits on when a stopped motorist may be detained under Oregon's Failure to Display statute were addressed by this Court in *United States v. Izguerra-Robles,* 660 F.Supp.2d 1202 (D. Or. 2009). There, as here, the government contended that the defendant was lawfully arrested and placed in handcuffs for failing to display his driver's license. Judge Haggerty rejected the government's argument and found that "[t]he scope of this arrest exceeded that authorized by ORS 807.570" because "the police should have verified [defendant's] identity, issued him a citation, and sent him on his way." *Id.* at 1207.

Page 17 **MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

In so holding, the Court emphasized that the Oregon Failure to Display statute authorizes a police officer to detain a person "'only for such time as reasonably necessary to investigate and verify the person's identity,'" and "does not allow 'officers to use it as a ploy to conduct otherwise unauthorized searches.' Once the person's identity is verified, 'detention is no longer reasonably necessary and the individual must be released.'" *Id.* (citations omitted); *see also United States v. Washington*, 739 F. Supp. 546, 549, 551 (D. Or. 1990) (finding that where the officer was "satisfied as to [defendant's] identity before he asked [defendant] for permission to search the trunk of [his] vehicle," defendant "was detained beyond the time allowed by ORS 807.570").

Oregon courts have similarly held that, where an officer detains a defendant after he has "verified his identity, that detention was unlawful under ORS 807.570(4), and evidence obtained as a result of the illegal detention must be suppressed, even if defendant consented to the search. Any consent necessarily resulted from [the officer's] having exploited the illegal detention." *State v. Auer*, 90 Or.App. 459, 463-64 (1988) (citations omitted).

Officer Lehman's arrest and detention of Mr. Jackson directly violated ORS 807.570(4)'s restriction on the lawful authority to detain a person "only for such time as reasonably necessary to investigate and verify the person's identity." The text of Oregon's Failure to Carry or Present a License statute is abundantly clear: when a person's identity

**Page 18 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

is known, detention is not authorized. The Supreme Court has repeatedly directed that courts are to interpret statutes according to their plain text. *See Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[I]n interpreting a statute a court should always turn to one, cardinal canon before all others" and "must presume that a legislature says in a statute what it means and means in a statute what it says there.").

The facts presented by Mr. Jackson's detention are particularly egregious. Not only did Mr. Jackson provide his full name to Officer Lehman early on in the traffic stop, which Officer Lehman purposefully chose not to run and opted instead to conduct a drug investigation, but Officer Lehman actually knew Mr. Jackson's identity from the commencement of the stop. Accordingly, there was no need to detain Mr. Jackson to verify his identity. His identity was known to the officer.

Officer Lehman's knowledge of Mr. Jackson's identity is demonstrated repeatedly throughout the course of the traffic stop. It is shown through the statements Officer Lehman made to Mr. Jackson, the information he provided to police dispatch, and Officer Lehman's recorded cell phone call that he placed after the search of Mr. Jackson's vehicle.

**Page 19 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

Immediately after Officer Lehman directed Mr. Jackson to exit his vehicle and placed him in handcuffs, Officer Lehman called Mr. Jackson by his middle name, "Cody," the name by which Mr. Jackson is generally known.  Officer Lehman used the name "Cody" to refer to Mr. Jackson even though Mr. Jackson never told Officer Lehman that this was his middle name or otherwise provided such information. To the contrary, Mr. Jackson gave Officer Lehman only his first and last name, Richard Jackson, when he asked Officer Lehman to run his driver's license through police dispatch.

Clearly, Officer Lehman was aware of Mr. Jackson's identity from the moment he first made contact with Mr. Jackson as the driver of the stopped vehicle, if not before.[4] While questioning handcuffed Mr. Jackson, Officer Lehman told Mr. Jackson that word "on the street" was that Mr. Jackson was "running some dope and running some guns."

Officer Lehman's knowledge of Mr. Jackson's identity is also shown by the officer's statements to police dispatch, documented in the video recording of the traffic stop. When, after much delay, Officer Lehman eventually radioed into police dispatch, a full ten minutes into the stop, to give Mr. Jackson's name and request a driver's license

-------------------

[4] Indeed, it is possible that Officer Lehman's knowledge of Mr. Jackson's association with the stopped vehicle was the basis for his vehicle being singled out for a traffic stop. Notably the vehicle that was positioned between Mr. Jackson's vehicle and Officer Lehman's police car was not stopped for speeding though it was traveling at approximately the same speed as Mr. Jackson's vehicle.

Page 20 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION

and criminal history check, Officer Lehman relayed Mr. Jackson's full name, Richard

Cody Jackson, not just Mr. Jackson's first and last name, which was all Mr. Jackson had

provided. After Mr. Jackson's driver's license quickly came back as "valid," Officer

Lehman told police dispatch to disregard his request for a criminal history check because

Officer Lehman "already knew" that Mr. Jackson had felony convictions. In Officer

Lehman's subsequent cell phone call, detailing the circumstances of Mr. Jackson's arrest

and Officer Lehman's criminal drug investigation, Officer Lehman likewise provided Mr.

Jackson's full name and gave other details about Mr. Jackson that did not stem from the

traffic stop. Officer Lehman was clearly well aware of Mr. Jackson's identity throughout

this traffic encounter.

Since Officer Lehman knew Mr. Jackson's identity from the commencement of the

stop, Officer Lehman's arrest and detention of Mr. Jackson clearly exceeded the statutory

authority of the Oregon Failure to Carry or Present a License statute which restricts an

officer's detention for this misdemeanor traffic offense to the time "reasonably necessary

to investigate and verify the person's identity."  ORS 807.570(4).  Because Officer Lehman

knew Mr. Jackson's identity, no time was needed to investigate and verify this.

In addition to lacking authority to detain Mr. Jackson, Officer Lehman also

unlawfully prolonged the length of the traffic stop well beyond the time necessary to

issue a traffic citation. When Officer Lehman finally ran Mr. Jackson's driver's license

**Page 21 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

through police dispatch, ten minutes into the traffic stop, police dispatch responded quickly, in approximately one minute, that Mr. Jackson had a "valid" driver's license.

Officer Lehman's repeated questioning of Mr. Jackson about drug activity did not relate in any way to the traffic offense of Failure to Carry or Present a License. Notably, when Mr. Jackson told Officer Lehman his name, that he had a valid driver's license, and asked Officer Lehman to run his driver's license, Officer Lehman did not contact police dispatch to confirm Mr. Jackson's license. Rather Officer Lehman simply continued to question handcuffed Mr. Jackson, again and again, about his drug activities, asking whether he had any "dope." When Mr. Jackson did not reply, Officer Lehman told Mr. Jackson, "You're not answering my question," "I'm asking you a simple question." The officer told Mr. Jackson that he would be "fair" and lenient with him, that it didn't mean he had "to go to jail," and similar words that were designed to elicit incriminating statements from Mr. Jackson. Officer Lehman did so as part of a criminal investigation into drug activity that was unrelated to the traffic stop.

When Officer Lehman unlawfully detained Mr. Jackson and expanded the traffic stop in order to conduct an unrelated drug investigation, he exceeded the mission and

lawful scope of the traffic stop and thereby violated Mr. Jackson's Fourth Amendment

rights as well as the Oregon traffic statute and constitution.[5]

**B.    Mr. Jackson Did Not Knowingly And Intelligently Waive His *Miranda* Rights Prior To Being Questioned By The Police Officers And His Statements Must Be Suppressed.**

According to the police reports, Mr. Jackson made a number of incriminating

statements while detained, following his arrest. Mr. Jackson did not knowingly,

intelligently, and voluntarily waive his *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600,

608 n.1 (2004) (noting that the government must show by a preponderance of the evidence

that a valid *Miranda* waiver was given and that any statements were given voluntarily);

*see also Miranda v. Arizona*, 384 U.S. 436, 475 (1966) ("[A] heavy burden rests on the

government to demonstrate that the defendant knowingly and intelligently waived his

privilege against self-incrimination and his right to retained or appointed counsel."). Any

---

[5] The level of intrusion during a stop, similar to that displayed here, has also been held to trigger the probable cause requirement. *See e.g. United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003) (transporting vehicle occupants away from the scene of the stop requires probable cause); *United States v. Rodriguez*, 869 F.2d 479, 483 (9th Cir. 1989); *United States v. Strickler*, 490 F.2d 378, 380-81 (9th Cir. 1974); *see also United States v. Bailey*, 743 F.3d 322, 340 (2d Cir. 2014) (holding that a lawful detention-incident-to-search became unlawful at the moment that police handcuffed the individual, because the police had already searched the individual for weapons and the government never argued that he was a flight risk); *Longshore v. State*, 399 Md. 486, 514 (Md. Ct. App. 2007) (holding that handcuffing a suspect turns an investigative stop into an arrest and thus requires probable cause absent "special circumstances," such as a reason to believe the suspect will flee or endanger the officer).

claim of such waiver must establish that the waiver was made by Mr. Jackson with a full understanding of "the nature of the right being abandoned and the consequences of the decision to abandon it" and "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Where, as here, statements are obtained as a result of an unlawful arrest and detention, the "question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal

quotation marks omitted) (finding that evidence admitted at defendant's trial was

inadmissible as the fruits of unlawful arrests or searches)."[6]

 In determining the validity of a *Miranda* waiver, courts consider the "totality of the

circumstances" surrounding the interrogation. *Moran,* 475 U.S. at 421 (citation omitted).

The "background, experience, and conduct of the accused" bears on this inquiry. *North*

*Carolina v. Butler*, 441 U.S. 369, 374–75 (1979) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464

(1938)). Furthermore, "courts indulge every reasonable presumption against waiver of

fundamental constitutional rights" and "do not presume acquiescence in the loss of

fundamental rights." *Zerbst*, 304 U.S. at 464 (internal citations omitted).

Here, Mr. Jackson was removed from his vehicle by a uniformed police officer,

driving a marked police car whose lights remained activated throughout the traffic stop.

---

[6] The Oregon Supreme Court has similarly applied an exclusionary rule remedy to violations of Oregon statutes governing investigative stops of individuals and vehicles. *See State v. Porter,* 312 Or. 112, 121 (1991) ("The trial court should have suppressed the evidence obtained in violation of ORS 810.410(3), because the object of that statute is to define the authority of officers to respond to a traffic infraction.") For purposes of federal law, the reasonableness of police search activity is undermined by failure to comply with state law regarding police officer authority and activity. *See United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993) ("[I]n evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest."); *see also United States v. Shepherd*, 21 F.3d 933, 936 (9th Cir. 1994) ("We look to state law to determine the lawfulness of an arrest by a state officer for a state offense.").

He was immediately placed in handcuffs on a busy public road and informed that he was under arrest for Failure to Carry or Present a License, though he had a valid driver's license and informed the arresting officer of this. In addition, the arresting officer knew Mr. Jackson's identity from the commencement of the stop. Rather than pursuing the traffic stop, Officer Lehman immediately embarked on a criminal investigation into unrelated drug and firearm activities. When Mr. Jackson, who remained in handcuffs throughout, refused to answer the officer's unrelated questioning, Officer Lehman stated, "Okay, let's walk back to my car," and made other repeated statements that the officer would be "cool" and "work with" Mr. Jackson, designed to illicit incriminating statements. Mr. Jackson's detention violated the relevant Oregon statute and his state and federal constitutional rights against unreasonable seizures and detention. Any alleged waiver by Mr. Jackson of his *Miranda* rights under these circumstances, was not voluntarily given and was the fruit of his unlawful arrest and detention.

In *Izguerra-Robles,* this Court found, under a similar factual scenario, that there was a "causal connection" between "the illegal action and the tainted evidence" and that suppression of the evidence was justified. 660 F.Supp.2d at 1207. Like Mr. Jackson here, the defendant in *Izguerra-Robles* was arrested and placed in handcuffs for violating Oregon's Failure to Display or Carry a License statute and read his *Miranda* rights. The *Izguerra-Robles* Court found that "[b]ecause defendant was unlawfully arrested, the drugs

**Page 26 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

found in his car as a result of the subsequent search, as well as the incriminating statements he made at the police station, can be suppressed as 'fruit of the poisonous tree.'" *Id.* at 1207 (citation omitted).  The Court emphasized that "both the discovery of the drugs and the defendant's subsequent statements occurred as a direct result of defendant's illegal arrest and that there were no intervening circumstances indicating that the evidence should not be suppressed." *Id.* at 1208; *see also Washington*, 739 F.Supp. at 550-51 (this Court held that where defendant "was detained beyond the time allowed by ORS 807.570," defendant "did not consent to a prolonged detention" and police search exceeded the scope of the consent given by the defendant); *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004) (signed consent form found to be invalid where it was tainted by illegal conduct): *United States v. Abarza,* 143 F.Supp.3d 1082, 1094-95 (2015), *clarified on reconsideration, United States v. Abarza,* 199 F.Supp.3d 1270 (2016) (where police unreasonably extended the scope of the traffic stop, defendant's consent to search of his vehicle was not voluntary); *Rodgers*, 347 Or. at 626, 630 (police officer's "questions and request to search the car were not part of the traffic investigation" and "given the temporal proximity between the illegal detention" and the consent to search and "the absence of any other intervening circumstances," the consent to search was "a product of the unlawful seizure" and the evidence obtained during the search must be suppressed).

**Page 27 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

## Conclusion

For the reasons set forth above, Mr. Jackson moves this Court for an order excluding as evidence all items seized subsequent to the illegal seizure of his person and search of his vehicle. The evidence obtained from the illegal search of Mr. Jackson's vehicle, as well as Mr. Jackson's statements, must be suppressed as fruits of the police officer's violation of his Fourth and Fourteenth Amendment rights. The evidence sought to be excluded, both physical and verbal, is the direct product of the illegal stop and detention of Mr. Jackson.

It is clear that the stop, arrest, and detention of Mr. Jackson was precipitated by the officer's speculative suspicion that Mr. Jackson was engaged in drug and firearm activity. It was this suspicion that occasioned the stop, and then prolonged the stop beyond the time needed to complete the moving vehicle infraction ticket. When Officer Lehman repeatedly asked whether drugs were located in Mr. Jackson's vehicle and for permission to search his vehicle, Mr. Jackson was outside his vehicle, handcuffed on a busy public road, visible by vehicles and people passing by or in the vicinity, while he was being detained by a uniformed police officer whose marked police vehicle overhead lights remained activated throughout the stop. Indeed, Officer Lehman specifically told Mr. Jackson to "be straight with" him because this would result in "less time out here in front of everybody." *See e.g., United States v. Montgomery*, 561 F.2d 875, 883 (D.C. Cir. 1977)

**Page 28 MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM OF LAW IN SUPPORT OF MOTION**

("[T]he intrusiveness of a police stop of a private motorist is to be measured not only by objective criteria, such as the period of time for which the vehicle is detained, but also in terms of the stop's subjective impact. A roving police stop is a more serious intrusion than a predicted checkpoint inspection, because the unexpected stop is pregnant with greater annoyance and inconvenience, and more likely to frighten or embarrass.").

The purpose of this seizure and subsequent search was not to secure evidence of the traffic violation, but evidence of another suspected crime. In order to pass constitutional muster, the police officer needed specific and articulable facts to justify an objectively reasonable suspicion that Mr. Jackson was in possession of controlled substances or firearms at the time he was arrested and questioned by the officer, which Officer Lehman lacked. Accordingly, the seizure and detention of Mr. Jackson was constitutionally unlawful, and all evidence seized and statements obtained as a result of his arrest, search, and seizure should be suppressed.

Respectfully submitted this January 9, 2018.

 /s/ Susan Russell
Susan Russell
Assistant Federal Public Defender