IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD CODY JACKSON,<br><br>Defendant. | Case No. 3:16-cr-00453-AA-1<br>**OPINION AND ORDER** |

AIKEN, District Judge:

In November 2016, defendant Richard Cody Jackson was indicted on one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). In January 2018, defendant moved to suppress evidence seized and statements elicited during the traffic stop that led to his arrest. The parties appeared for a suppression hearing on June 25, 2018. For the reasons set forth below, defendant's motion is granted.

## BACKGROUND

This summary is based on the evidence presented at the suppression hearing: the testimony of Officer Jonathan Lehman and audio/video footage of the stop.

Page 1 – OPINION AND ORDER

At 3:43pm on October 4, 2016, Officer Johnathan Lehman initiated a traffic stop of a black 2008 Ford Fusion driven by defendant. Officer Lehman clocked the vehicle traveling twenty-seven miles per hour in a school zone, seven miles per hour above the speed limit. Officer Lehman testified that when he pulled the vehicle over, he did not know the identity of the driver or how many people were in the car.

After defendant pulled over, Officer Lehman approached the vehicle, introduced himself, and told defendant he had been pulled over for speeding. He asked defendant if he had a driver's license and registration. Officer Lehman testified that defendant turned toward the center console to search for his wallet and that, as he did so, defendant moved his body to block the officer's view of the center console. The video footage of that portion of the stop shows Officer Lehman moving his head and body in an apparent attempt to gain a better view into the car. Officer Lehman testified that, despite his obscured view, he saw a cylindrical object with black tape wrapped around one end between the driver's seat and the center console. Officer Lehman stated that, based on his experience and training, he knew that people often wrap black tape around the end of a weapon to facilitate a better grip.

Defendant told Officer Lehman that he could not find his wallet and identified himself as "Richard Jackson." At the hearing, Officer Lehman testified that, although he had never met defendant before, he knew the name "Richard Cody Jackson" through contact with people on the street and from police briefings. He assumed that he had stopped the same Richard Jackson. He knew through those law enforcement contacts that Richard Cody Jackson was involved in drug and weapons trafficking and that he generally went by the name "Cody."

At that point, just over one minute into the stop, Officer Lehman asked defendant to step out of the car and placed him in handcuffs, telling him he was being detained for "failure to carry

and present." Defendant responded, "I have my wallet—can I grab it for you?" Officer Lehman replied, "I thought you didn't have your wallet. Now you do have your wallet?" Using the radio attached to his uniform, Officer Lehman reported to dispatch that he had "one detained." He did not ask defendant to provide his date of birth or other information that could have been used to corroborate his identity. He did not request backup or ask dispatch to verify whether "Richard Jackson" or "Richard Cody Jackson" had a valid driver's license.

Officer Lehman put on black gloves and asked defendant where his wallet was. Defendant asked to be allowed to retrieve the wallet, and Officer Lehman stated that he would not allow defendant to go "digging around" in the vehicle because he had seem "some kind of weapon or stick or something." Officer Lehman did not frisk defendant for weapons or ask any questions about the cylindrical object in the car. Officer Lehman testified that he did not believe a pat-down was necessary because defendant was wearing loose basketball shorts and the weight of a weapon, if present, would have been visibly noticeable. On cross-examination, Officer Lehman stated that it is "routine" for him to put on gloves during a traffic stop when he asks the driver or other occupants to step out of the car.

Officer Lehman told defendant that he was "not under arrest" but was "not free to go." Officer Lehman gave defendant his *Miranda* warnings, which defendant acknowledged he understood. Officer Lehman then asked defendant about the location of the wallet and offered to "grab it" for him. Defendant said he was not sure of the wallet's location. At 3:46pm, three minutes into the stop, Officer Lehman said, "So here's the deal, Cody. I know what you do, I know what you're about, and I have a drug dog in my car. I'm just letting you know that right up front. Okay? I'll be cool with you and I'll work with you. You're nervous as heck. You're

shaking uncontrollably right now. I'll be cool with me—you work with me, I'll work with you. Simple as that."

Officer Lehman then asked defendant if he had a "little dope" on him. He continued to question defendant about drugs for two minutes. At one point, he told defendant that "word on the street is you've been running some dope and running some guns." He also stated that "if there's dope in the car now would be a good time to tell me" because he was planning to get his drug dog out of the car. Defendant did not answer Officer Lehman's questions.

At 3:48pm, five minutes into the stop, Officer Lehman radioed for backup. Once again, he neither asked defendant for corroborating identifying information such as date of birth nor asked dispatch to run defendant's license.

Officer Lehman again asked defendant whether there were drugs in the car. Defendant admitted that there was "some dope" in the car. Shortly thereafter, about a minute after Officer Lehman's request for backup, a second patrol car arrived on the scene. After the backup officer got out of the vehicle, defendant told Officer Lehman that the "dope" was methamphetamine. Officer Lehman pressed defendant for the specific location of the drugs. He told defendant to "make it easier on both of us" by providing that information, because it would mean "less time out here in front of everybody."

At 3:51pm, eight minutes into the stop, Officer Lehman asked for consent to search defendant's vehicle. Apparently referring to defendant's admission that the car contained methamphetamine, Officer Lehman said, "now I can search it." Defendant responded "now you can, yeah." Defendant then told Officer Lehman he would find drugs and a gun in a shoebox on the seat of the vehicle. At 3:52pm, Officer Lehman asked defendant for this first time if he had weapons on his person and conducted a *Terry* pat-down. He searched the vehicle and found the

shoebox containing methamphetamine, a gun with the serial number scratched off, and defendant's Idaho driver's license. Officer Lehman also found $3,000 in cash in the vehicle's center console.

At 3:53pm, nine minutes into the stop, Officer Lehman radioed police dispatch for the first time since reporting that he had "one detained" and asked them to run a license and criminal history check on "Richard Cody Jackson." One minute later, at 3:54pm, dispatch informed Officer Lehman that defendant had a valid driver's license; Officer Lehman told dispatch to disregard his prior request for a criminal history check because he "already" knew about defendant's prior felony convictions.

At 3:55pm, Officer Lehman made a cell phone call, informing the recipient "I just stopped Richard Cody Jackson . . . I didn't know if you wanted to do anything or even give it a shot, but I just wanted to give you a heads up." At the hearing, Officer Lehman stated that the recipient of the call was a detective on the Blue Mountain Enforcement Narcotics Team.

At 4:12pm, defendant was placed in the back of Officer Lehman's police car. After being arrested, defendant told officers that he had been dealing drugs to pay bills and that he purchased the brand new gun in Idaho.

Officer Lehman testified that, in order to write any traffic citation, it is necessary to verify the identity of the driver. When the driver is unable to produce a driver's license, police officers must pull up a photo of the driver in databases available to them through mobile data terminals in their vehicles. Officer Lehman testified that people who are stopped sometimes lie about their identity and that he has, in the past, ferreted out those lies by comparing the name provided to the photo in the database. Officer Lehman stated that because of the cylindrical object in the vehicle, he did not believe it would be safe to leave defendant unattended so that he

could pull up defendant's photo on his mobile terminal. He further testified that he radioed for backup so that he would be able to safely verify defendant's identity.

## STANDARDS

The Fourth Amendment prohibits unreasonable searches and seizures by the government. U.S. Const. amend. IV. Ordinarily, the defendant bears the burden of proof on a motion to suppress evidence. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). However, because warrantless searches are presumptively unreasonable, the government bears the burden of proving that a warrantless seizure did not violate the Fourth Amendment. *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). "Evidence derivative of a Fourth Amendment violation—the so-called fruit of the poisonous tree—is ordinarily tainted by the prior illegality and thus inadmissible, subject to a few recognized exceptions." *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (internal citations and quotation marks omitted).

A traffic stop is permissible if the police have reasonable suspicion to believe that a traffic violation has occurred. *United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005). "The fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop." *United States v. Wallace*, 213 F.3d 1216, 1219 (9th Cir. 2000). However, whether the duration of a traffic stop is reasonable "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Those tasks include "determining whether to issue a traffic ticket" and "ordinary inquiries incident to the traffic stop," including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the

automobile's registration and proof of insurance." *Id.* at 1615 (internal quotation marks omitted and alterations normalized). The officer may also "take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* at 1616.

There is no blanket prohibition on looking for evidence of other crimes during a traffic stop. But such inquiries may not "measurably extend the duration of the stop" unless the officer has "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615 (citations omitted). The Ninth Circuit has specifically "held that prolonging a traffic stop to perform an ex-felon registration check or a dog sniff is unlawful because these tasks are aimed at detecting evidence of ordinary criminal wrongdoing and are not ordinary inquiries incident to the traffic stop." *Gorman*, 859 F.3d at 715 (alterations normalized) (internal quotation marks and citation omitted).

"The concept of reasonable suspicion, like probable cause, is not readily, or even usefully reduced to a neat set of legal rules." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted). The standard is lower than probable cause, but nonetheless requires an objective justification. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000). More than a hunch, "reasonable suspicion exists when an officer is aware of specific articulable facts that, when considered with objective and reasonable inferences, form a basis for a *particularized* suspicion." *Id.* (emphasis in original). Particularized suspicion has two elements: (1) "the assessment must be based on the totality of the circumstances[,]" and (2) "the assessment must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." *Id.* (emphasis omitted).

## DISCUSSION

Defendant asserts that Officer Lehman improperly extended the traffic stop to pursue a hunch about drug and weapon crimes. The government counters that the detention and subsequent search were appropriate because a weapon-shaped object was seen in the driver's console, defendant admitted—post-*Miranda* warnings—that there were drugs and a gun in the car, and defendant gave consent to search the vehicle.

I. *Officer Lehman had probable cause to initiate the stop and was justified in asking defendant to step out of the vehicle, but impermissibly prolonged the traffic stop to investigate drug and weapon crimes.*

To begin, it is clear that Officer Lehman had probable cause to stop defendant for a traffic violation. Defendant was clocked going twenty-seven miles per hour in a twenty-miles-per-hour zone. Moreover, once defendant failed to produce identifying documentation, Officer Lehman had probable cause to believe that defendant was violating Oregon law by failing to carry and present a valid driver's license. However, Officer Lehman did not have reasonable suspicion to believe that a drug or weapon crime was being (or was about to be) committed until defendant admitted that "some dope" and a gun were in the car. Officer Lehman deviated from inquiries reasonably related to investigation of the traffic offense to ask the questions that elicited those admissions. Moreover, considering the totality of the circumstances, those questions measurably extended the duration of the stop and cannot be justified on the grounds of officer safety.

At argument, defense counsel noted that Officer Lehman began putting gloves on as soon as defendant stepped out of the car, suggesting that he had already formed the intent to search the vehicle for drugs at that point. I am not convinced; I find Officer Lehman's testimony that it is "routine" for him to put on gloves whenever he is handcuffing someone credible.

Nevertheless, I find that Officer Lehman impermissibly deviated from the purpose of the stop when he asked defendant to step out of the car. Officer Lehman testified that he recognized the name "Richard Cody Jackson" from law enforcement contacts and his statements to defendant show that he believed defendant was involved in drug trafficking. Based on a hunch that fell short of reasonable suspicion, Officer Lehman quickly commenced questioning defendant about drugs inside the vehicle. Essentially, Officer Lehman hit "pause" on investigating the crimes for which he had probable cause to detain defendant (speeding and failure to carry/present) so that he could ask questions about drugs and guns (likely related to a general hunch based on Officer Lehman's knowledge of defendant's identity and criminal history). It is only after he elicited an incriminating admission and searched the vehicle that he returned to the inquiries related to the traffic violation.

The government argues that deviation from investigating the traffic violations was justified by Officer Lehman's concern for his own safety. When a police officer sees something that could be a weapon during a traffic stop, he has the authority to remove an individual from a vehicle and take additional steps to ensure his own safety. *United States v. I.E.V.*, 705 F.3d 430, 434–35 (9th Cir. 2012). The officer may perform a pat-down, order occupants out of a vehicle, or search areas where an occupant could reasonably reach for a weapon. *See Knowles v. Iowa*, 525 U.S. 113, 117–18 (1996) (collecting cases). Because Officer Lehman observed an object in the car that could have been a weapon, he was justified in requiring defendant to step outside the car. Defendant makes much of the fact that he continued to tell Officer Lehman that he could find his license in his car. Officer Lehman, having seen a black club-like object, was under no obligation to put his safety at risk by permitting defendant to continue searching for the license.

Page 9 – OPINION AND ORDER

Officer safety concerns do not, however, justify Officer Lehman's questions about drugs and guns. Officer Lehman made a passing reference to "running guns," but those questions were about trafficking in weapons generally and were not focused on immediate safety concerns. Moreover, Officer Lehman's direct questions all focused on whether defendant had any "dope." There is no officer safety justification for such questioning. I find that Officer Lehman's primary motivation for asking defendant to step out of the vehicle and placing him in handcuffs was to put defendant in a position where he would be likely to yield to questioning about drugs and guns. Officer Lehman did not perform a pat-down, search the vehicle, or ask defendant any questions about the cylindrical object in the car, belying the government's argument that defendant was handcuffed for officer safety reasons.

Officer Lehman testified that, having seen the cylindrical object in the car, he needed to wait for backup to arrive before he could safely return to his vehicle to perform the necessary database searches to verify defendant's identity. But Officer Lehman did not request a cover officer when he initially radioed in that he had "one detained." Instead, he spent several minutes questioning defendant about drugs. It is only after defendant repeatedly refused to answer those questions that Officer Lehman radioed for backup. I am not persuaded by Officer Lehman's testimony that he requested backup so that he could safely investigate the traffic infractions. Instead, I find that Officer Lehman radioed for backup in attempt to increase the likelihood that defendant would yield to his questions.

Officer Lehman's questions about drugs added time to the stop. When Officer Lehman requested backup, it took only one minute for a cover officer to arrive, and when Officer Lehman radioed dispatch with defendant's name, a "return" came back in less than one minute. Officer Lehman spent more than two minutes questioning defendant about drugs before backup arrived,

thereby adding at least two minutes to the stop. It does not matter that two minutes is a relatively short amount of time; the Supreme Court has expressly rejected the argument that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation." *Rodriguez*, 135 S. Ct. at 1616. That "no bonus time" rule applies with equal force to situations like *Rodriguez*, where the officer conducted a dog sniff after issuing the warning for the traffic violations, and to situations like this one, where the officer took a "break" from investigating the traffic violations to investigate a hunch about other criminal activity.

Officer Lehman's questions about drugs and guns violated the Fourth Amendment. Evidence obtained through processes that violate the Fourth Amendment is inadmissible. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (explaining that "'evidence later discovered and found to be derivative of an illegality'" is "'fruit of the poisonous tree.'" (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984))). Accordingly, defendant's statements about "dope" and guns in the vehicle discovered in violation of his Fourth Amendment rights must be suppressed. Furthermore, the gun, drugs, and cash found in the car are all inadmissible unless defendant validly consented to a search of the vehicle.

II. *Defendant's consent to search of the vehicle did not purge the taint of the earlier Fourth Amendment violations.*

The government argues that, even if Officer Lehman's questions about drugs violated the Fourth Amendment, all evidence from the search was lawfully obtained because defendant consented to search the vehicle. "[T]he question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (internal quotation marks omitted). Evidence must be suppressed if any purported

consent was "not sufficiently attenuated" from the unconstitutional conduct that preceded it. *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988). "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

It is the government's burden to establish that the consent was voluntary and untainted by Fourth Amendment violations. *United States v. Fuentes*, 800 F. Supp. 2d 1144, 1156 (D. Or. 2011). To determine whether the challenged evidence is sufficiently attenuated from the primary taint, courts consider: "(1) the temporal proximity between the consent and the unlawful conduct; (2) the presence of intervening circumstances; [and] (3) . . . the purpose and flagrancy of the initial misconduct." *Washington*, 490 F.3d at 776 (applying *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975) to determine whether consent to search was tainted by Fourth Amendment violation).

In *Washington*, a police officer made contact with the defendant, who was sitting in the driver's seat of a parked vehicle. *Id.* at 767. The car was legally parked and the officer did not suspect the defendant of committing any crime. Nevertheless, he asked the defendant to step out of the car to be searched. *Id.* at 768. The defendant consented to a pat-down, which the officer performed next to his squad car while another officer blocked the defendant's path back to the vehicle. Immediately after completing the pat-down, the officer requested consent to search the vehicle. The defendant agreed, and the search yielded a firearm, which led to him being indicted and convicted on a felon-in-possession charge. *Id.* at 769.

On appeal, the Ninth Circuit held that the firearm should have been suppressed. *Id.* at 767. The court held that the defendant had validly consented to the initial pat-down, but that the pat-down "escalated into an impermissible seizure[,]" *id.*, because a reasonable person in the defendant's position would not have felt free to leave immediately after the pat-down ended, *id.* at 773–74. Applying the three-factor test outlined above, the court concluded that the defendant's consent to search of the vehicle had not "purged the taint" of the unlawful seizure. *Id.* at 776. First, the court found that there was "no time lapse" because the officer "requested . . . consent to search the car immediately after [the] search of [the defendant's] person, and while [the defendant] was illegally seized." *Id.* at 777. Second, the court found "no appreciable intervening circumstances." *Id.* The court also held that the third factor "weigh[ed] against the government" because the officer "was on a fishing expedition in the hope that something illegal might turn up." *Id.* (internal quotation marks omitted) (alteration normalized).

Here, just as in *Washington*, defendant's consent did not remedy the original Fourth Amendment violation. Here, the Fourth Amendment violation was the impermissible extension of the duration of the traffic stop. Accordingly, like in *Washington*, the Fourth Amendment violation was ongoing when defendant consented to the search. Alternatively, if the time lapse is calculated from the end of the unlawful questioning, only three minutes passed between defendant's admission that "dope" was in the vehicle and his consent to search of the vehicle.

Regarding the second factor, there are no intervening circumstances to remedy the preceding Fourth Amendment violation. Indeed, the way in which Officer Lehman obtained consent underscores the continuing connection to that violation: referring back to defendant's admission that there was "dope" in the car, Officer Lehman said "now I can search it." This

Page 13 – OPINION AND ORDER

reminder of his earlier admission, obtained in violation of his Fourth Amendment rights, apparently prompted defendant to agree, "now you can, yeah."

Finally, with respect to the third factor, the clear purpose of the questioning, as in *Washington*, was to search for "evidence in the hope that something might turn up." *Brown*, 422 U.S. at 605. Although Officer Lehman maintains that the stop, detention, and subsequent investigation revolved around speeding and failure to carry/present, the totality of the circumstances clearly shows that this is not the case. In this case, defendant's consent to search was invalid because it was tainted by the prior Fourth Amendment violation. Accordingly, the gun, methamphetamine, and cash seized from the car must be suppressed.

## CONCLUSION

Defendant's Motion to Suppress (doc. 33) is GRANTED.

IT IS SO ORDERED.

Dated this 5th day of July 2018.

_____
Ann Aiken
U.S. District Judge